IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of | No. 88404-2-I |
| C.L., | DIVISION ONE |
| Appellant. | UNPUBLISHED OPINION |

DÍAZ, J. — A trial court committed C.L. to 14 days of involuntary detention pursuant to the involuntary treatment act (ITA), ch. 71.05 RCW. C.L. now argues the State failed to adduce sufficient evidence proving she was gravely disabled. Disagreeing, we affirm.

I.    BACKGROUND

In January 2025, C.L.'s daughter called a King County designated crisis responder (DCR), who came to C.L.'s home and then filed a petition for a 120-hour initial detention under RCW 71.05.153. Valley Cities Recovery Place Kent (Valley Cities), to which C.L. was admitted, then sought to commit C.L. for 14 more days.

On June 25 and 26, the court held a hearing on the petition.[1] After hearing

---

[1] The record does not indicate what caused the delay between the initial petition for detention, filed in January 2025, and the hearing on the 14-day commitment

testimony from C.L.'s daughter and a Valley Cities mental health counselor, the court found that C.L. was gravely disabled. And the court found that a less restrictive alternative treatment was not in C.L.'s best interest. The court ordered an additional 14 days of involuntary treatment. C.L. timely appeals.

## II. ANALYSIS

Pursuant to RCW 71.05.240, a court must hold a probable cause hearing on a petition requesting an order for up to 14 days of involuntary treatment and may only enter such an order if, at the conclusion of the hearing:

> the court finds *by a preponderance* of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, . . . *is gravely disabled*, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others[.]

RCW 71.05.240(4)(a) (emphasis added).

The ITA further provides two alternate definitions of "gravely disabled," namely:

> a condition in which a person, as a result of a behavioral health disorder:
>
> (a) [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or
> (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).

The court found that C.L. was gravely disabled under both RCW

held 6 months later.

71.05.020(25)(a) and (b). This court reviews whether substantial evidence supports the trial court's findings of fact, and whether the findings then support the conclusions of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "'Substantial evidence is a quantum of evidence sufficient to persuade a fair-minded person.'" *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021) (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." *Id.* We hold that there was substantial evidence to support the finding of grave disability under the standard set out by RCW 71.05.020(25)(b), with regard to both of its subparts, as follows.[2]

As to the first part of the standard under RCW 71.05.020(25)(b), C.L. claims the record did not support the court's finding that she "had an escalating loss or deterioration in routine functioning." We disagree.

Her daughter testified that although C.L. has experienced religious delusions for many years, she was relatively stable for about seven years. She was able to converse and spend time with family. She would communicate about her medication.

In May of 2024, C.L. was hospitalized because she stopped showering and eating properly. She had stopped letting her daughter bring her groceries, accusing her of being "evil" and not really being her daughter. She received a diagnosis of paranoid schizophrenia. She was prescribed medication during her

---

[2] Because RCW 71.05.020(25) sets out two equally valid bases for finding a person gravely disabled, we need not additionally assess the extent of the evidence in the record of grave disability according to RCW 71.05.020(25)(a).

hospital stay and then released. After her release, she stopped taking her medication.

C.L. again began experiencing religious delusions. She stopped sleeping and showering. She stopped accepting food from her daughter and lost significant weight. She clogged all her toilets and "started using the bathroom in garbage bags." She dumped water "all over the floors to the point where the floors are caving in." She destroyed her mobile home to the point that the city of Kenmore condemned it so that "no one is allowed to occupy it in its current state." From this evidence, a reasonable person could conclude that C.L. had experienced "a deterioration in routine functioning." RCW 71.05.020(25)(b).

In response, C.L. argues that the evidence does not support such a finding because C.L. had improved since she was initially admitted to Valley Cities. She argues that because she had improved, any evidence of deterioration is not sufficiently recent.

C.L. is correct that both her daughter and the Valley Cities counselor testified that her symptoms had improved somewhat since she entered the facility. But even the day before the hearing, she told the counselor that "the devil had made her clog the toilet and that, again, demonic forces were at play during these events." This delusion, in context of her previous unsafe behavior resulting from similar delusions, is substantial evidence to support the court's conclusion that C.L. still had "substantially deteriorated in her functioning," including recent proof of significant loss of cognitive control. *LaBelle*, 107 Wn.2d at 208.

C.L. also expressed that she would stop taking medication if released. Our

Supreme Court held in *LaBelle* that the statute allows the State to "treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" 107 Wn.2d at 206 (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395, 410 (1985)). By adding this prong of the statute, the legislature intended to "provide the kind of continuous care and treatment that could break the cycle" of release and rehospitalization. *Id.* at 206. The court may rightly not "release a person whose condition, as a result of the initial commitment, has stabilized or improved minimally . . . even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for his or her health or safety." *Id.* at 207. The court therefore was not, as C.L. argues, required to release her because her symptoms showed some improvement.

The court in this case properly considered C.L.'s "prior decompensation when not under treatment and discontinuing [her] medication, [her] dangerous behavior as a result of [her] serious mental disorder when not medicated, [her] lack of appreciation for the necessity of taking [her] medication, [her] stated intent to discontinue medication unless ordered by the court, and the very high probability that [her] behavior will once again become dangerous . . . if not under court order to take [her] medication." *In re Det. of C.K.*, 108 Wn. App. 65, 77, 29 P.3d 69 (2001). We hold that there was a sufficient basis for a rational person to conclude

it was more likely than not that C.L. manifested "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and [was] not receiving such care as [was] essential for his or her health or safety." RCW 71.050.020(25)(b).[3]

We therefore conclude that substantial evidence supports the court's finding that C.L. was gravely disabled.

### III.     CONCLUSION

We affirm the trial court's order.

Díaz, J.

WE CONCUR:

Chung, J.

---

[3] C.L. does not argue that the court lacked evidence for the second element of RCW 71.05.020(25)(b), which requires that she was "not receiving such care as is essential for his or her health or safety." To meet its burden, the State must prove that "'the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.'" *C.K.*, 108 Wn. App. at 74 (emphasis omitted) (quoting *LaBelle*, 107 Wn.2d at 208). For the sake of completeness, we hold that there is ample evidence supporting the court's finding that C.L. would not receive essential care outside the hospital for substantial evidence, including that her plan was to return to living independently in her mobile home even though the "home . . . [had] been condemned" and that she planned to stop taking her medication.